IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
BEAUFORT DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| | ) | |
| v. | ) | Cr. No. 9:23-00394-RMG |
| | ) | |
| | ) | |
| CORY HOWERTON FLEMING, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

## DEFENDANT CORY HOWERTON FLEMING'S SENTENCING MEMORANDUM AND MOTION FOR DOWNWARD VARIANCE FROM THE SENTENCING GUIDELINES

Defendant Cory Howerton Fleming, by and through his undersigned counsel, hereby respectfully files this sentencing memorandum. For the reasons set forth below, Mr. Fleming respectfully requests the Court recognize his cooperation, acceptance of responsibility, personal history, and nature of the offense and impose a sentence substantially below the guidelines range of 46 to 57 months which is "sufficient but not greater than necessary to comply with" the goals of sentencing set forth in 18 U.S.C. § 3553(a).

## I.     INTRODUCTION

Mr. Fleming is the only person charged in connection with the crimes involving Alex Murdaugh who has come forward and expressed remorse; acknowledged his wrongdoing; agreed to be held accountable for his misconduct; and not objected to any portion of the Presentence Report ("PSR"). On May 25, 2023, pursuant to a written plea agreement, Mr. Fleming pled guilty plea to Count One of the one-count Information (ECF No. 1) which charged him with Conspiracy to Commit Wire Fraud in violation of 18 U.S.C. § 371. (ECF Nos. 4, 13).

Not only has Mr. Fleming admitted to the criminal conduct for which he is pleading guilty, he is genuinely remorseful and ashamed of his conduct. Since he began cooperating, he has done everything possible to accept full responsibility and atone for his actions. Mr. Fleming did not attempt to evade prosecution; he has pled guilty and has been cooperating with the United States Attorney's Office, the Federal Bureau of Investigation, and the Office of Disciplinary Counsel. Mr. Fleming acknowledges and regrets the pain that he has caused the victims in this case. Mr. Fleming respectfully requests that the Court sentence him keeping his entire life in perspective – including his acceptance of responsibility, personal history, and the nature of the offense. We ask that he be sentenced to a period of time which would be "sufficient but not greater than necessary to comply with" the goals of sentencing set forth in 18 U.S.C. § 3553(a).

## II.  <u>Procedural History</u>

On March 10, 2022, Mr. Fleming was charged in a state court Indictment with a total of thirty (30) counts, including Obtaining Goods or Services by False Pretenses; Money Laundering; Computer Crime; Criminal Conspiracy; False Statement or Misrepresentation; and Breach of Trust with Fraudulent Intent. The subject of this Indictment was the Gloria Satterfield case. On April 14, 2023, Mr. Fleming was charged in another state court Indictment with a total of eleven (11) counts including Breach of Trust with Fraudulent Intent; Computer Crime; and Criminal Conspiracy. The subject of this Indictment was the Hakeem Pinckney case. These state charges are currently pending and are for the same criminal conduct outlined in Mr. Fleming's PSR.

On May 25, 2023, Mr. Fleming made the very difficult decision to plead guilty to the federal charges without any assurances or plea agreement in state court. He pled guilty to Count One of the Information pursuant to a plea agreement. (ECF No. 13). In the plea agreement, the parties agreed that the total amount of money received in the Satterfield case by Mr. Fleming and

his former law firm ($676,255.59) has been disgorged to the victim in this case. (ECF No. 4 ¶8). Mr. Fleming has agreed to be completely truthful and to cooperate in the government's ongoing investigation. To date, Mr. Fleming has cooperated and been debriefed on multiple occasions for days at a time. He has also been cooperating with the Office of Disciplinary Counsel ("ODC") on a multitude of matters.

### III.   A variance is justified based on the application of the § 3553(a) factors and the directive that a sentence be "sufficient but not greater than necessary."

The Supreme Court's decision in *Booker* rendered the U.S. Sentencing Commission Guidelines advisory and returned greater discretion to judges at sentencing. *United States v. Booker*, 543 U.S. 220 (2005). The Courts now "may vary from Guideline ranges based solely on policy considerations including disagreements with the Guidelines." *Kimbrough v. United States*, 552 U.S. 85, 101 (2007) (citation omitted). The sentencing Court must still "give respectful consideration" to the applicable guidelines range under the advisory guidelines; however, "*Booker* permits the court to tailor the sentence in light of other statutory concerns as well." *Kimbrough*, 552 U.S. at 101 (citations and internal quotation marks omitted).

In *United States v. Martin*, 520 F.3d 87, 90-91 (lst. Cir. 2008) the court stated that sentencing a defendant:

> necessitates a case-by-case approach, the hallmark of which is flexibility. In the last analysis, a sentencing court should not consider itself constrained by the guidelines to the extent that there are sound, case-specific reasons for deviating from them. Nor should a sentencing court operate in the belief that substantial variances from the guidelines are always beyond the pale. Rather the Court should "consider every convicted person as an individual and every case as a unique study in the human failings that sometimes mitigate, sometimes magnify, the crime and the punishment to ensue."

*Id.* at 91 (quoting *Gall v. United States*, 552 U.S. 38, 52 (2007)). Thus, mitigating circumstances and substantive policy arguments that were formerly irrelevant in all but the most unusual cases

are now post-*Booker* potentially relevant in every case. *United States v. Glover*, 431 F.3d 744, 752-753 (11th Cir. 2005) (Tjoflat, J. specially concurring). *See also, United States v. Huerta-Rodriguez*, 355 F. Supp.2d 1019, 1023 (D. Neb. 2005) ("post-*Booker*, the Sentencing Reform Act (SRA) requires the sentencing court to regard the guidelines' ranges as one of the many factors to consider in determining the sentence").

In making a sentencing determination, "[a] district court must begin 'by correctly calculating the applicable Guidelines range." *Gall*, 552 U.S. at 51. However, the Guidelines are merely the starting point and not the only consideration. *Id.* The court also must " 'make an individualized assessment based on the facts presented.' " *United States v. Carter*, 564 F.3d 325, 328 (4th Cir. 2009) (*quoting Gall*, 552 U.S. at 50). "That is, the sentencing court must apply the relevant § 3553(a) factors to the specific circumstances of the case before it." *Id.*

The sentencing court's "overarching" duty is to "impose a sentence sufficient, but not greater than necessary," to accomplish the goals of sentencing and comply with the statutory directives set forth in § 3553(a). *Kimbrough*, 552 U.S. at 101. Thus, the Court should consider:

(1)  the nature and circumstances of the offense and the history and characteristics of the defendant;
(2)  the need for the sentence imposed –
    (A)    to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;
    (B)    to afford adequate deterrence to criminal conduct;
    (C)    to protect the public from further crimes of the defendant; and
    (D)    to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner;
(3)  the kinds of sentences available;
(4)  the kinds of sentence and the sentencing range established…;
(5)  any pertinent policy statement…;
(6)  the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct; and
(7)  the need to provide restitution to any victims of the offense

18 U.S.C. §§ 3553(a)(1) - (7).

Moreover, as the Fourth Circuit recently reiterated, the sentencing court is required to specifically conduct individual assessments of a defendant's mitigating circumstances. In *United States v. Black* the court vacated and remanded for resentencing based on the district court's failure to expressly consider the defendant's mitigating evidence. No. 21-4022, 2022 WL 1223715, * 4 (4th Cir. Apr. 26, 2022) (vacating and remanding for resentencing). The court held that while "many criminal defendants have experienced childhood traumas, suffer from various mental health and addiction issues, and have children that must grow up without them while they serve time," "sentencing courts are charged with conducting individualized assessments in each case to account for the boundless array of circumstances that might have informed a defendant's poor choices." *Id.* *4 (citing *Gall*, 552 U.S. at 50 (requiring district judges to "make an individualized assessment based on the facts presented"). Rejecting the government's contention that Black's argument were merely routine and stock mitigation arguments, the Court held that Black presented more than mere platitudes, and it would not "trivialize Black's experiences by calling them 'stock' or 'routine.'" *Id.*

As the Court fashions a sentence based on a consideration of the Guidelines and the statutory factors, it must be mindful that no special weight is to be given to the advisory guidelines as opposed to the other factors mentioned in § 3553(a). *See Rita v. United States*, 551 U.S. 338 (2007) (holding that a sentencing court does not enjoy the benefit of a legal presumption that the guideline sentence should apply); *see also United States v. Biheiri*, 356 F. Supp. 2d 589, 594 (E.D. Va. 2005) (finding no individual factor is singled out as having greater weight, instead the richness of factual diversity in cases calls on sentencing judges to consider all of the factors and to accord each factor the weight it deserves under the circumstances). A district court may reject a sentence within the advisory Guidelines range because "the case at hand falls outside the 'heartland' " to

which the individual Guidelines apply or because a sentence within the Guidelines fails to reflect the other § 3553(a) factors or "because the case warrants a different sentence regardless." *Rita*, 551 U.S. at 351.

Here, there are a variety of mitigating factors under § 3553(a) which weigh heavily in favor of a sentencing variance substantially below the advisory guidelines range and are discussed in more detail below. Moreover, Mr. Fleming has submitted numerous letters in support, all of which speak highly of his strong family ties, good character, and positive actions throughout his life, including his life-long dedication to various charities and his community. *See* **Exhibit 1 – Character Letters**. Further, Mr. Fleming has essentially no criminal history[1]; he has accepted responsibility; and there is little chance of him re-offending. He has submitted his resignation to both the South Carolina and Georgia Bars and he will never practice law again. Additionally, he is fifty-four years old, an age when recidivism declines significantly. *See generally*, Older Offenders in the Federal System, at 5, 42 (U.S. Sentencing Comm'n July 26, 2022), https://www.ussc.gov/research/research-reports/older-offenders-federal-system (finding that age and criminal history exerted a strong influence on recidivism and that the recidivism rate for older offenders (over 50) was less than half of offenders under 50). Finally, older offenders are also more likely to receive sentences that vary from the guidelines, *id.* at 45, and are sentenced to probation at twice the rate of offenders under the age of 50, *id.* at 54.

Based on these factors, a downward variance is appropriate. *See United States v. Oldani*, No. 3:09-cr-00010, 2009 WL 1770116, at *7 (S.D.W. Va. June 16, 2009) (noting that a factor weighing in favor of reduced sentence is low statistical probability of recidivism for defendants

---

[1] Aside from a misdemeanor conviction for possession of alcohol by a minor in 1987 when Mr. Fleming was 18 and an arrest for a liquor law violation in October 1990, when he was 22. He has a criminal history score of 0. (PSR ¶¶68-69).

with little to no criminal history); *see also United States v. Robinson*, No. 13-cr-436 JLL, 2014 WL 1400197, at *5 (D.N.J. Apr. 9, 2014) (finding downward variance appropriate based on defendant's dedication to charity, which was "not something that was just done after the charges," and his "strong family values and family support," and he had no prior criminal record); *United States v. Todd*, 618 F. Supp. 2d 1349, 1354 (M.D. Ala. 2009) (finding that the defendant's "family ties . . . were exceptional" and supported request for downward variance). For all of these reasons, the Court should impose a sentence substantially below the guidelines.

### Consideration of Section 3553(a) Factors Favor a Sentence Substantially Below the Advisory Guidelines Range.

### 1.     The History and Characteristics of the Defendant

One of the first factors the Court must weigh in crafting a sentence is the history and characteristics of the offender. First and foremost, Mr. Fleming has done an enormous amount of self-reflection since this investigation began. He has not attempted to blame other people for his misconduct. He is ashamed and regretful of his actions and he has taken responsibility by pleading guilty.

### a.     Personal History

Mr. Fleming is currently fifty-four years old. He was born in Columbia, South Carolina to young, financially struggling parents. His father was attending the University of South Carolina and his mother was studying to be a dental hygienist at Midlands Technical College. His parents moved to Savannah, Georgia when he was seven years old and divorced when he was twelve (12). He is the only child of this marriage. Despite the divorce, Mr. Fleming grew up with two loving parents in Savannah, Georgia. To this day, he has an extremely close relationship with both of his

parents and step-parents.

Mr. Fleming attended the University of South Carolina obtaining an undergraduate degree in finance and a law degree in 1994. After he became a member of the South Carolina Bar in November of 1994, he began his law career as an Assistant Solicitor in the Fourteenth Circuit Solicitor's Office working for Randolph Murdaugh and living in Hampton, South Carolina. In 1996 he began private practice in Beaufort, South Carolina at Moss and Kuhn which later became Moss, Kuhn & Fleming. His practice consisted of approximately 90% criminal cases and 10% civil cases.

On October 8, 2021, Mr. Fleming was placed on interim suspension from the South Carolina Bar. He has since submitted his voluntary resignation to both the South Carolina and Georgia Bars. By submitting this voluntary resignation, he has agreed to never reapply for admission to the South Carolina or Georgia Bars. This would be a difficult decision for most lawyers, particularly one who truly loved the practice of law like Mr. Fleming. However, Mr. Fleming is steadfast in his belief that he no longer deserves the privilege of practicing law.

As noted above, Mr. Fleming has essentially no prior criminal history. [2] As many of his

---

[2] Of note, the United States Sentencing Commission has proposed an amendment to the Sentencing Guidelines, effective November 2023, for zero-point offenders, like Mr. Fleming. *See* USSG § 4C1.1. Under the proposed amendment, zero-point offenders would benefit from a two-level guideline reduction, except in limited circumstances, including cases in which the defendant's acts or omissions resulted in a substantial financial hardship to one or more victims. The two-level decrease may be retroactive and would only apply when the defendant did (1) not receive any criminal history points; (2) not receive a terrorism adjustment under 3A1.4; (3) not use violence or threats of violence in the offense; (4) not commit an offense resulting in death or serious bodily injury, or a sex offense;(5) not personally cause substantial financial hardship; (6) not possess of a gun or other dangerous weapon, or get someone else to do so); (7) not commit an offense involving individual rights, a hate crime, or serious human rights offense); or (8) not receive a USSG § 3B1.1 role adjustment and was not engaged in a 21 USC § 848 continuing criminal enterprise. As outlined in the guidelines, in determining whether conduct caused a substantial financial hardship, courts should consider, among other things, whether the offense resulted in the victim suffering a substantial loss of a retirement, education, or other savings or investment fund.

friends, colleagues, and family write, Mr. Fleming's values are his family and community's shared values. He has deep community roots and has always been willing to help others. (**Exhibit 1 - Character letters**).   Mr. Fleming's misconduct in this case is not representative of his true character as illustrated by his charitable actions and the many accomplishments he has attained in his life. According to those who know Mr. Fleming best, his actions in this case do not define him: his "bad decisions are not the total story of who this man is and <u>who he will become</u> in the years ahead." As many of his friends, colleagues, and family write, Mr. Fleming is "generous," "a true friend," "kind," "dedicated," "hard-working," —a person who has been generous with his time and advice, willing to give so that others can better their lives, and someone they can rely on when needed. It is apparent from reading these letters that Mr. Fleming is someone that they hold in high regard and that his conduct was an aberration.

### b.  <u>Mr. Fleming's Family Life</u>

The success of Mr. Fleming's family is, in part, a reflection of his character. Mr. Fleming has been married to his wife for over 25 years and they have raised two amazing children ages 22 and 19. The Flemings met shortly after law school. Mr. Fleming's wife has devoted her career to being a Public Defender: First, in Richland County from 1988 until May 1993 and later in Beaufort County from June 1993 until March 2001. She worked part-time (practicing family law) while their children were younger and, then, in January 2017, she returned to the Beaufort County Public Defender's Office where she spends her days representing juveniles – the majority from impoverished backgrounds. Although the work can be stressful and challenging, it is work she is proud of and passionate about.

Mr. Fleming has been a devoted husband and father. Due in part to his efforts, his children have grown into kind, hard-working, civic minded, and successful adults. The Flemings have

demonstrated and emphasized generosity, community involvement, and hard work in raising their children. Their daughter just graduated from college summa cum laude with a double major in Government and German. She was a member of the college's Division I cross country team for one season and ran in the Southern Conference Championship. She received the highest award in her department which is given by the faculty to the outstanding graduating senior on the basis of academic achievement, character and intellectual promise. She held part time jobs and volunteered while in college.

Mr. Fleming's son is a junior in college majoring in philosophy and minoring in economics. He has been active in student committees and children's theatre productions; has had part time jobs; and volunteers for a number of charities.

The fact that his children are thriving is not an accident. Many of the character letters written to the Court describe Mr. Fleming as an involved and engaged parent. One who was loving, supportive, and patient. He was the coach of his son's little league football and soccer teams. His daughter's love of running was inspired by Mr. Fleming who has always been an avid runner and has enjoyed sharing this activity with her throughout her life. With both of his children, Mr. Fleming attended every sports event; every school activity, every theatre production, and every Cub Scout outing.

The character letters also describe Mr. Fleming as someone who helped mentor, support, and guide other children in the Beaufort community. Mr. Fleming has also been a staple in the Beaufort community for parents that had children who were struggling. He was often asked to meet with and counsel a child who was starting to slip into some trouble and he always did so - without ever charging a fee. As expressed in several of the letters of support, there are many who have gratitude to Mr. Fleming for helping them through an extremely difficult time with a child in

legal trouble. There are also people who have appreciated Mr. Fleming's assistance in coaching and mentoring children who did not have that type of support at home. The Flemings' home has always been a home where children gathered because they felt loved without judgment. Mr. Fleming was there to offer advice, cook a big meal, and listen.

There are many stories of Mr. Fleming helping people in the Beaufort community *pro bono*. One in particular that stands out involves the long-term tenant the Flemings had in a rental house they owned. They rented the house for twelve years to a single mother of two children who was employed with the Department of Social Services. During that time, this woman struggled financially to make ends meet. The Flemings often forgave the rent for the months that she could not afford to pay. They also never raised the rent and allowed her to raise her children in this house much to their own financial detriment. These acts of kindness were done over a long period of time and outside of the public eye.

Mr. Fleming is a man of faith. Throughout their marriage, the Flemings have attended St. Helena Episcopal Church where they were married and both of their children were baptized. The Bible study led by the Associate Rector, has been critical in helping Mr. Fleming cope with the stress of both the state and federal investigations. The Bible study and the support that he has received there is the cornerstone of his week.

Finally, and perhaps, most importantly, in the character letters, many confirm Mr. Fleming has expressed sorrow and remorse for his misconduct. As one eloquently notes, "he places blame where it should be, on his own shoulders" and he has "recalibrated his moral compass in the direction of repentance and rehabilitation."

      c.  **<u>Community Involvement</u>**

Both Mr. Fleming and his wife have always been active in their church and community—

regularly volunteering, serving on local boards, and/or attending fundraisers. Almost every single character letter includes a comment about Mr. Fleming's community involvement or his importance to the community. As one writer notes, "[t]here were few philanthropic or volunteer community initiatives … that did not involve Cory." He served on the YMCA Board of Directors for many years in the late 1990s to mid-2000s, serving as president of the Board during 2001-2002. The YMCA of Beaufort County was first chartered in 1994, and thus this period was critical in the development of the YMCA of Beaufort County. Mr. Fleming's leadership and commitment helped establish the YMCA of Beaufort as the positive force that it now is in the community. He has continued to support the YMCA through the years with financial contributions and participation in their sponsored events. He has also served on EC Montessori School Board during the 2012 – 2013 time period. Mr. Fleming has been a supporter of the Child Abuse Prevention Association; the local children's non-profit theatre group; the Lowcountry Montessori School; HELP of Beaufort; and the Rotary Youth Exchange Program.

After his law licenses were suspended, Mr. Fleming searched for a way to use his time and skills for the betterment of his community and to cope with the stress of the investigation. He began attending community college at the Technical College of the Low Country with the long-term goal of improving his carpentry and construction skills. In November of 2021, Mr. Fleming became a weekly volunteer at Habitat for Humanity in Beaufort, South Carolina. Habitat for Humanity has been a silver lining throughout this very difficult time for Mr. Fleming; he loves the work just as much as he appreciates the purpose and objective of the organization. He is committed to volunteering to Habitat for Humanity for the rest of his life. It is an endeavor that he did not have time to perform while he was still practicing law, but which has fulfilled a purpose that he didn't even realize was lacking in his life.





### Nature and Circumstances of the Offense

Indeed, Mr. Murdaugh's decades of misconduct against clients and the murder of his wife and child have been highly publicized. However, Mr. Murdaugh's notoriety should not be to Mr. Fleming's detriment. Mr. Fleming admits that as an attorney he abused a position of trust and that he had a role in the scheme to defraud the Satterfields. Yet, Mr. Fleming did not know the depth and extent of Mr. Murdaugh's misconduct against the Satterfields and others. Like many people, Mr. Fleming was under the impression that Mr. Murdaugh was a successful attorney from a wealthy and influential family who was happily married and a loving father.

Mr. Fleming has admitted to significant failings in breaking the law and deceiving his clients. He was part of a scheme to defraud clients to obtain money through the improper handling, disbursement, and retention of settlement funds and the improper collection of expenses and attorney's fees, Mr. Fleming is also mindful that, as an attorney, he has damaged the public's trust in the legal profession, and he accepts that he must be held accountable.

Mr. Fleming, however, has assisted the government, accepted responsibility, and pled guilty for his role in the conspiracy.[3] Failure to consider and give significant weight to Mr. Fleming's cooperation and assistance would undermine a system that encourages cooperation and early acceptance of responsibility. Further, considering the nature and circumstances of the offense to which he has pled guilty and his cooperation, Mr. Fleming respectfully submits that a sentence below the guidelines is "sufficient, but not greater than necessary, to comply with the purposes" of sentencing.

### 3. The Need for the Sentence Imposed to Reflect the Seriousness of the Offense, Provide Just Punishment, Adequate Deterrence, and Protection from Future Crimes

Relevant to this consideration is the defendant's degree of cooperation with law enforcement and early acceptance of responsibility. Weighing these factors promotes respect for the courts and rule of law because those who accept responsibility relieve the Government early of their obligation to prepare for trial. Further, it demonstrates that they acknowledge their wrongfulness of their actions and are remorseful. Mr. Fleming agrees his offense was serious, and he is deeply remorseful for his actions. He appreciates that his actions have impacted innocent people and he wants to atone for his mistakes. For these reasons, he has accepted responsibility, pled guilty, and cooperated with the Government.

Moreover, deterrence can be obtained by the prosecution and conviction itself. The personal and reputational consequences Mr. Fleming has suffered are more than sufficient to

---

[3]"If a district court believes that the Guidelines' downward adjustment for acceptance of responsibility is insufficient . . . it may express this belief by imposing a lower sentence." *See United States v. Aljabari*, 626 F.3d 940, 951 (7th Cir. 2010).

discourage him from engaging in similar conduct. Other than the instant conduct, Mr. Fleming has led an exemplary life. The consequences of his misconduct and subsequent prosecution (along with the extreme publicity surrounding his conviction) will serve as a significant general deterrence. *See, e.g. Wayte v. United States*, 470 U.S. 598, 607 (1985) (observing that any prosecution has a "general deterrence value"); *United States v. Gamarra*, 940 F.3d 1315, 1321 (D.C. Cir. 2019) (observing that prosecution itself provides general deterrence). Moreover, the additional collateral punishments, such as the loss of his law license, forced resignation from his position at his law firm, the loss of income, and harm to his reputation and that of his family, will adequately punish Mr. Fleming and deter him and others from participating in this type of crime. *See United States v. Pauley*, 511 F.3d 468 (4th Cir. 2007)(finding consideration of loss of pension and teaching certificate consistent with §3553(a)).

Because Mr. Fleming has essentially no prior criminal history, has accepted responsibility, and pled guilty to the charge against him, he has demonstrated that he is not at risk to recidivate. Further, given his circumstances and cooperation, he respectfully submits that an extended prison sentence for him will not serve any specific deterrent purpose. Accordingly, a sentence below the guidelines is "sufficient, but not greater than necessary, to comply with the purposes" of sentencing.

### 4. <u>The Need for the Sentence Imposed to Provide the Defendant with Needed Educational or Vocational Training, Medical Care, or Other Correctional Treatment in the Most Effective Manner</u>.

Mr. Fleming is looking forward to continuing as a productive member of society in the future. Because Mr. Fleming will be unable to return to his legal career, he has already begun to pursue an alternate career path by taking courses in construction and carpentry at the Technical College of the Low Country. He would benefit from further educational or vocational training in these trades.

**5.** **The Kinds of Sentences Available**

Mr. Fleming asks that the Court recommend a kind of sentence that allows him to receive educational and vocational training, counseling, and release to halfway house, house arrest, or other transitionary sentence at a certain point. Such a type of sentence would serve the statutory purposes of sentencing. In addition, based upon the location of Mr. Fleming's family and extended family, Mr. Fleming requests that the Court recommend a Bureau of Prisons designation to FCI Jesup's minimum security satellite prison. *See* 18 U.S.C. § 3621 (providing that BOP shall designate the place of imprisonment considering, inter alia, the recommendation of the sentencing court).

**6.** **The Need to Avoid Unwarranted Sentence Disparities**

The sentencing guidelines range for Mr. Fleming is 46 to 57 months to be followed by a term of supervised release of one to three years. (PSR ¶¶ 100, 102, 107). This significant range reflects the inclusion of multiple sentencing enhancements which have a cumulative effect. (PSR ¶¶ 78. 79). Moreover, Mr. Fleming is facing state charges for the exact same conduct and has no agreement regarding the length of his sentence or that his state sentence will be run concurrent to his federal sentence. As a result, it is even more imperative that the Court also consider the need

to avoid unwarranted sentencing disparities for similar conduct among defendants with similar records.

Paragraphs 123-126 of the PSR contains the following relevant information from the U.S. Sentencing Commission's JSIN database (https://www.ussc.gov/guidelines/judiciary-sentencing-information):

> During the last five fiscal years (FY2018-2022), there were 300 defendants whose primary guideline was § 2B1.1, with a Final Offense Level of 23 and a Criminal History Category of I, after excluding defendants who received a § 5K1.1 substantial assistance departure. For the 273 defendants (91%) who received a sentence of imprisonment in whole or in part, the average length of imprisonment imposed was 34 month(s) and the median length of imprisonment imposed was 36 month(s).

Although the sentencing data provided does not reflect the Commission's recommendation regarding the appropriate sentence to be imposed or represent the Commission's official position on any issue or case, it is appropriate information for the Court to consider as part of its consideration of the factors in 18 U.S.C. § 3553(a) in imposing sentence.

When reviewing sentences in similar federal and state cases in South Carolina, Mr. Fleming's guideline range is significantly higher than many other defendants. Similarly, many of these cases involve attorneys and/or defendants who were in positions of trust. The attached table in **Exhibit 3** is a sampling of cases in South Carolina over the last twenty years that involved attorneys and/or public officials and/or elected officials. These cases are merely examples of analogous prosecutions and are by no means represent all of the economic crime cases prosecuted in South Carolina.

A very recent example of a similar defendant prosecuted by both the United States Attorney's Office and the South Carolina Attorney General's Office is the Kevin Marsh prosecution. Marsh was the former CEO of SCANA who pled guilty to one count of conspiracy to

commit wire fraud in violation of 18 U.S.C. § 371 in federal court. Mr. Marsh acknowledged an integral role in the largest fraud scheme in the state's history. SCANA investors and customers were defrauded. Approximately $9 billion dollars was misspent while gross misrepresentations were made to the public in the building of a nuclear powerplant. Mr. Marsh was sentenced to twenty-four (24) months on the federal charges and to ten (10) years suspended on the state charges by a state court judge. *See United States v. Marsh*, No. 3:20-cr-727-001-MGL (D.S.C. Oct. 7, 2021).

Perhaps even more egregious than the enormous loss amount in the SCANA case was the case involving the Richland County Fifth Circuit Solicitor, Dan Johnson. Mr. Johnson was also prosecuted by both the United States Attorney's Office and the South Carolina Attorney General's Office. Mr. Johnson was an elected official and member of the South Carolina Bar who repeatedly abused the public's trust by stealing public money from solicitor/public accounts to use on personal purchases. Mr. Johnson pled guilty to wire fraud in violation of 18 U.S.C. § 1343 and was sentenced to twelve (12) months and one (1) day imprisonment. *United States v. Johnson*, No. 3:18-cr-00863-CMC (D. S.C. Jun. 5, 2019),

The most recent attorney federal prosecution – other than the instant case - appears to be *United States v. Lord*, No 3:22-cr-00768-MGL (D.S.C. Mar. 21, 2023). Ray Lord, an attorney and former law enforcement officer, misappropriated $1.5 million in COVID relief funding. In 2020 and 2021, he submitted fraudulent loan claims on behalf of his law firm, a business that he owned called Palmetto Safety Supply, and New Life Ministries of Irmo according to the federal Indictment. The Government described Mr. Lord's conduct as "egregious." Mr. Lord pled guilty to wire fraud in violation of 18 U.S.C. § 1343 and was sentenced to 18 months in prison. *Id.*

Again, the above cited cases and the cases listed in Exhibit 3 are not an all-inclusive list, but merely a snapshot of the cases involving attorneys and public officials of which the undersigned counsel is aware. In comparing these cases with the facts of this case as they relate to Mr. Fleming and the nature of and circumstances of the offense, along with his cooperation and acceptance of responsibility, a sentence below the guidelines range is warranted to avoid any sentencing disparity. Additionally, a sentence below the guidelines is also supported by studies finding that non-Government-sponsored sentences in white collar cases generally fall well below the minimum Guidelines range, typically 50-70 percent lower.[4] Mr. Fleming submits that given the precedent of these cases, sentencing him to an extended sentence of incarceration would be greater than necessary and could create an unwarranted sentencing disparity.

## IV.  **CONCLUSION**

Consideration of the factors of § 3553(a)— in particular, the "history and characteristics of the defendant" (§ 3553(a)(1)); the nature of the offense, the deterrence factor; the need to protect the public; and the need to avoid "unwarranted sentence disparities" (§ 3553(a)(7))—demonstrates that a variant sentence is necessary to achieve the key sentencing directive that the sentence be sufficient but not greater than necessary to fulfill the purposes of sentencing. Mr. Fleming respectfully requests that the Court consider a sentence below the guidelines as an appropriate sentence in this case.

---

[4] For example, research conducted of white collar sentences in the Southern District of New York, showed that non-Government sponsored below-range sentences "were, on average, fifty to seventy percent shorter than the minimum Guidelines sentence." Jillian Hewitt, Note, Fifty Shades of Gray: Sentencing Trends in Major White-Collar Cases, 125 Yale L.J. 1018, 1051 (2016).

Respectfully submitted,


/s/ Deborah B. Barbier
Deborah B. Barbier, LLC (#6639)
1811 Pickens Street
Columbia, South Carolina 29201
(803) 445-1032
(803) 445-1036
dbb@deborahbarbier.com

*Attorney for Defendant Cory Howerton Fleming*

Columbia, South Carolina
August 9, 2023